**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LARRY BANKS and WALTER CARLOS, | ) | |
| | ) | Case No.: 07-cv-5654 |
| Plaintiffs, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| v. | ) | |
| | ) | |
| RAUL ALMAZAR, TAJUDEEN | ) | |
| IBRAHIM, GREG DOUGHERTY, DR. | ) | |
| FARAZANA HUSAIN, and DR. MICHAEL | ) | |
| WATROUS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this long-lived lawsuit, Plaintiffs Larry Banks ("Banks") and Walter Carlos ("Carlos") allege that Defendants violated their constitutional rights while they were involuntarily committed to the Elgin Mental Health Center. In its memorandum opinion and order of February 26, 2010, the Court dismissed portions of Plaintiffs' Fifth Amended Complaint [123]. The remaining claims, each premised on 42 U.S.C. § 1983, are as follows: (1) both Plaintiffs allege that Defendants Almazar and Ibrahim, in their individual capacities, violated their rights to practice Islam under the Free Exercise Clause of the First Amendment by denying them access to Jumu'ah services (Count III); (2) both Plaintiffs allege that Defendants Almazar and Ibrahim, in their individual capacities, violated their Fourteenth Amendment Equal Protection rights by purposefully discriminating against them on the basis of their religion (Count IV); and (3) Banks alleges that Defendants Almazar, Ibrahim, Dougherty, Husain, and Watrous, in their individual capacities, violated his First Amendment rights by failing to provide him with an adequate diet that met his religious needs (Count VII).

Before the Court are the parties' motions for summary judgment. Defendants move for summary judgment on all of the remaining aspects of the complaint [150]. Plaintiffs move for summary judgment on the aspects of Counts III and IV discussed above, and argue that disputed questions of fact preclude summary judgment for either party on Count VII [153]. For the following reasons, Defendants' motion [150] is respectfully denied and Plaintiffs' motion [153] is granted in part and denied in part. Further, Plaintiffs' motion for law library time [167] is respectfully denied; however the clerk is directed to mail a copy of this order to the executive director of the Cook County Correctional Center.

## I.     Background[1]

---

[1] The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements. L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact. See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). Plaintiffs have not responded to Defendants' statement of additional facts in response to their motion for summary judgment [159]. Accordingly, to the extent that each of the facts in Defendants' statement of additional facts is properly supported by record evidence and not controverted by a fact in Plaintiffs' statement, it is admitted. L.R. 56.1(a). Further, Defendants argue that Plaintiffs have impermissibly pled too many statements of fact without prior leave of Court. L.R. 56.1 states that "[a]bsent prior leave of Court, a movant shall not file more than 80 separately-numbered statements of undisputed material fact." Plaintiffs have filed a total of 78 statements. However, Defendants argue that some of the paragraphs contain more than one fact, and accordingly Plaintiffs are over the limit. The Court has scrutinized Plaintiffs statements of fact and concludes that Plaintiffs have substantially complied with L.R. 56.1. With that said, all L.R. 56.1 materials submitted by the parties in this case have been analyzed under the rubric set forth above. Rather than striking any offending material, the Court

The Elgin Mental Health Center ("EMHC" or the "Center") is the largest mental health facility in Illinois and services the majority of the involuntarily committed persons in the Chicago area. It is operated by the Illinois Department of Human Services, a subdivision of the State of Illinois. Plaintiffs were involuntarily committed to EMHC after being found unfit to stand trial for criminal offenses of which they were accused. Carlos was committed at EMHC from July 25, 2006 to November 2, 2007. Banks was committed from August 2, 2007 to June 6, 2008.

Defendant Raul Almazar ("Almazar") served as the Hospital Administrator of EMHC from before the time that either Plaintiff was admitted until January 2008. Defendant Tajudeen Ibrahim ("Ibrahim") is the Acting Administrator of EMHC and has held that title since he replaced Almazar. Dr. Bonnie Benzies (who is not a Defendant in this case) was the Director of Pastoral Care Services at EMHC while Plaintiffs were detained there. Defendant Greg Dougherty ("Dougherty") was Banks' social worker at EMHC. Dr. Farazana Husain ("Husain") was Banks' psychiatrist at EMHC. Dr. Michael Watrous ("Watrous") was Banks' psychologist at EMHC.

The Director of Pastoral Care Services coordinates all religious activity at the Center and is responsible for establishing and scheduling religious services, finding appropriate individuals to lead the services, accommodating patients' religious requests, and is the liaison between outside priests and residents of the facility. The Director of Pastoral Care Services reports to the Hospital Administrator.

The Hospital Administrator is ultimately responsible for ensuring that the religious rights of all patients at the Center are respected and observed and has final policymaking authority

---

simply has disregarded it for purposes of resolving the cross-motions for summary judgment.

regarding patients' religious requests. The Hospital Administrator creates an annual budget for EMHC and decides how funds are distributed so that EMHC fulfils its operational goals. Accordingly, the Hospital Administrator decides which clergy members are compensated for their services and the amount of compensation. If Dr. Benzies wanted a new religious service to be held at the Center or a clergy member to be added to the payroll, that request first had to be approved by the Hospital Administrator.

During the relevant time period, EMHC's "Policy and Procedure Manual," contained a written policy regarding the "Spiritual Needs of Patients/Pastoral Services." (See Pl. Ex. L). The policy recognized the "ethnic and cultural diversity" of EMHC's patient population and provided that "faith-specific opportunities" for worship were to be provided "to meet the varied spiritual needs of patients." Patients were to have "regular, on-going access" to religious services. *Id.* EMHC's practice is that residents can attend any religious service offered unless the resident poses an immediate security or safety risk or will disrupt the services and prevent others from worshipping. Security Therapist Aides ("STAs") or nurses would make the determination if a patient could go to a particular service.

EMHC maintains charts that show the breakdown of the religious affiliations of its patients. The information from these charts comes from the information patients provide when they fill out their paperwork for admission. As of August 2007, the chart contained separate categories for Jews, for Christians, and for several subcategories of Christianity (including Baptist, Catholic, Eastern Orthodox, Episcopalian, Lutheran, and Methodist). However, there was no separate category for Muslims—they instead were lumped into a category called "Non-Christians." Dr. Benzies testified that on average there were twice as many Muslim patients than there were Jewish patients at the Center and that on average the Muslim population fluctuated

between 10 to 15 individuals. Islam is one of the world's major religions and Muslims are well-represented in the Chicagoland area. As of October 2008, there were two Islamic mosques in Elgin, Illinois and eight mosques within 15 miles of EMHC. There are more than 50 imams in the Chicago area.

### A. Facts Relating to Denial of Jumu'ah Prayer Services

Plaintiffs are practicing Muslims who sincerely believe in the tenets of the Islamic faith. Plaintiffs sincerely believe that attending "Jumu'ah" services is central and essential to their practice of the Islamic religion.[2] (Defendants' Response to Plaintiffs' Statement of Facts ("Def. Resp. Pl. SOF") [158] at ¶ 11; Defendants' Response to Plaintiffs' Statement of Additional Facts ("Def. Resp. Pl. SOAF [164] at ¶ 1). Jumu'ah is commanded by the Koran and can only be conducted on Friday afternoons between the time the sun passes its zenith until it reaches the mid-point of its decline. See *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 344 (1987) ("Jumu'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer."). Jumu'ah is the central religious ceremony of Muslims and is comparable to the Saturday service of the Jewish faith or the Sunday service of various Christian sects. Attending Jumu'ah is obligatory for adult males, and it cannot be substituted by

---

[2] In their statement of undisputed material facts ([155] at ¶¶ 13-19), Plaintiffs attempt to establish the requirements of an acceptable Jumu'ah service according to Islamic doctrine. As explained here, traditional Islamic doctrine requires that Jumu'ah services satisfy a number of strict requirements. Defendants move to strike these statements of fact in part because they are "irrelevant." The Court agrees that whether Defendants provided Plaintiffs with Jumu'ah services that met with all of the strict requirements mandated by Islamic doctrine is not at issue in this litigation. "The question is not whether a restriction places a substantial burden on an average adherent, but whether the *plaintiff* is substantially burdened in practicing his sincerely held beliefs." *Jackson v. Raemisch*, 726 F. Supp. 2d. 991, 999 (W.D. Wis. 2010) (emphasis in original) (citing *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009) ("A person's religious beliefs are personal to that individual; they are not subject to restriction by the personal theological views of another.")). Accordingly, the canonical requirements of Jumu'ah services are relevant to this litigation only to the extent that Plaintiffs felt personally compelled to comply with them. Regardless, the Court will set forth the traditional requirements for Jumu'ah services as established by Plaintiffs as relevant background information.

another service or switched to another time. Jumu'ah must be performed in congregation under the leadership of an imam and typically takes less than an hour to hold.

While they were committed to EMHC, both Banks and Carlos made repeated requests for the opportunity to attend Jumu'ah. However, it is undisputed that during the time that Plaintiffs were committed, EMHC never held Jumu'ah services.[3]

During the time that he was committed, Carlos repeatedly asked members of his treatment team, the head nurse, other nurses, and STAs for the opportunity to attend Islamic services, including Jumu'ah services. In response, the nurses and STAs gave Carlos excuses as to why he could not go to Jumu'ah services, such as there was no one to pick him up, that the Center was short on staff, that individuals who were deemed unfit to stand trial could not go to the services, or that he should talk to the head nurse. Carlos spoke with a mediator on approximately two occasions and told her about his desire to attend Islamic services, including Jumu'ah. The mediator stated that she would forward his complaint to Defendant Almazar. At some point during his commitment, Carlos filed a complaint regarding his request to attend Islamic services and gave it to a nurse to put in his medical file to be submitted to the treatment team.[4]

_____

[3] See, *e.g.* Ans. Fifth Am. Compl. [135] at ¶ 27 ("Defendants admit that Jumu'ah services were not held while Plaintiffs were at EMHC, but deny that "the Center substantially burdened Banks and Carlos's exercise of their religion."); Def. Resp. Pl. SOF [158] at ¶ 39 ("39. * * * Throughout Plaintiffs' commitment at the Center, there were no Jumu'ah services. * * * ANSWER: Object- move to strike – Paragraph 39 contains more than one fact; the first sentence in non-material. Admit."); *id*. at ¶¶ 45-47; Def. Addl. SOF [159] at ¶ 8 ("Jumu'ah services were not available at EMHC while Banks was there.").

[4] During his deposition, Carlos testified that EMHC did have Muslim services on Monday and Friday during the 15 months that he was there, but that he was not allowed to go. (Carlos remembered hearing announcements for Muslim services over the loudspeaker, but when he asked about them at the nurses' station he was given various reasons why he could not go.) Carlos filed an affidavit in support of his motion for summary judgment in which he testified that upon further reflection, he was mistaken when he gave his prior testimony. (See Pl. Ex. N). Upon further reflection, Carlos cannot now say whether those announcements pertained to Jumu'ah services (although he assumed that they did at the time he heard them). Whether Carlos mistakenly believed that the Center held services on Monday and Friday during

While Banks was committed, he made repeated requests to the Center's staff, as well as to Almazar and Ibrahim personally for Jumu'ah services. These complaints eventually culminated in the filing of the instant lawsuit. Banks filed the instant lawsuit against Almazar on October 4, 2007 and added Carlos as a plaintiff on October 29, 2007.[5] Almazar received the complaint on November 19, 2007 (about two weeks after Carlos left EMHC). Further, Almazar testified that he was aware that Banks had been complaining about the lack of Jumu'ah services at the Center.

On May 15, 2008, Banks provided Defendant Dr. Watrous with a written administrative complaint complaining about the lack of Jumu'ah services for him to forward to Ibrahim. Banks did this because he was told that for any complaint to reach the Hospital Administrator, it had to be first given to a treatment team member who would then forward it on.

Due to budget constraints, EMHC relied on paid clergy and on volunteers to meet patients' religious needs. During the time that Plaintiffs were committed, EMHC paid a Christian priest to conduct Christian services on most Sundays (as well as to perform other duties). EMHC paid the Christian priest around $17.50 an hour to provide around 40-45 hours of service a month. The Center also paid a Jewish rabbi to give out challah bread and lead a blessing every other Friday. The rabbi earned around $20 an hour to provide about 12 hours of services a month. The Center also paid an ecumenical chaplain around $17.50 an hour to

his time there is of no import—it is undisputed that there were no such services and that the Center did not offer Jumu'ah services when Plaintiffs were at the Center. See *supra*, n.3.

[5] The original complaint [1] does not discuss the lack of Jumu'ah services—it only involves Banks' claims regarding his diet. The amended complaint filed on October 29, 2007 [6] discusses both grounds for relief.

provide 35-40 hours of service a month.[6]   Again, Almazar and Ibrahim had control over the

Center's budget and decided which priests would be paid and at what amount.

Since at least 2006, Almazar and Ibrahim did not offer a paid position to an Islamic

imam.  Ibrahim never looked into paying an imam because he believed that the ecumenical priest

adequately covered the needs of Muslim patients at the Center.  Dr. Benzies testified that she

asked the Hospital Administrators for funds to pay an imam in every budget request she made.

However, Almazar testified that he did not recall Dr. Benzies ever requesting funds specifically

for an imam.   Almazar and Ibrahim never made a request to the state legislature to increase

EMHC's budget for funds to pay an imam.[7]

While the Center did not hold Jumu'ah services, there were some activities in place for

Muslim patients.  Since 2005, the Center has held "Taleem" for Muslim patients.  Taleem is an

Islamic study period.  While Plaintiffs were committed at the Center, approximately four to nine

Muslim patients usually attended Taleem every week.  Taleem lasted an hour and a half and was

held in the visitor's room at the Center.  Banks attended the Taleem services "not over 11 times"

during his stay at the Center.[8]

The Center began holding Taleem studies in response to a request from another patient

around 2004.  In response to that request, Dr. Benzies called the Institute of Islamic Education in

Elgin to find someone to administer to the Center's Muslim patients.  The Institute of Islamic

---

[6] The ecumenical chaplain did not and could not hold Jumu'ah services because he was not qualified to lead such services.

[7] In fact, Amazar never requested or authorized additional spending for new paid clergy while he was Hospital Administrator.

[8] The Center required all individuals who were deemed unfit to stand trial to be escorted to Taleem by a Center staff member.  At certain times during his commitment, staff shortages prevented Banks from regularly attending Taleem.

Education is a local college that specializes in Islamic education. Dr. Benzies called the Institute two or three times, but never received a response until about a year later when Ali Toft (a teacher at the school) returned the calls and offered to volunteer to lead an "Islamic Studies Group." In 2007, Toft passed this role to his student, Arif Kamal. Neither Toft nor Kamal were paid for their time—they were both volunteers.[9]

Further, EMHC staff did not prevent Plaintiffs from praying with each other or alone. For example, Carlos and Banks spent time together in the day room standing and going through demonstrations of prayers, and EMHC staff did not stop them. However, Banks testified that Center staff told him that he could not be on the floor praying for extended periods of time, and Banks had difficulty doing some of his prayers because of the traffic of patients and staff at the Center.

Following Plaintiffs' departure from EMHC, an EMHC patient named Omar began leading Jumu'ah services. In his deposition, Banks testified that going to Jumu'ah services led by Omar would have been a satisfactory accommodation.

**B.      Facts Relating to Banks' Religious Diet Claims**

Banks sincerely believes that his Islamic faith requires him to adhere to a "halal" diet. Muslims who adhere to a halal diet cannot eat (among other things) pork or pork by-products. Banks also believes that normally acceptable food that comes into contact with (or has been placed on the same dish or tray as) a pork product becomes "haraam" (forbidden) to him. Accordingly, if pork or pork by-products were placed on Banks' meal tray, the entire tray was unacceptable to him.

_____

[9] Kamal did not lead Jumu'ah services. Kamal testified that he could have led Jumu'ah services at least once a month, but that no EMHC staff member or administrator ever asked him if he could lead those services. Banks, however, did ask Kamal if Kamal would lead Jumu'ah services. Kamal never asked Dr. Benzies or anyone else at EMHC for permission to do that.

EMHC has a written policy that recognizes religious diets. Residents are to communicate their religious diet requests to a doctor, who records them on a diet order form, which is transcribed by the nurses and forwarded to the kitchen. When Banks was first admitted to EMHC, he spoke to an EMHC doctor (a Dr. Chang) and told him about his dietary needs: No pork or pork by-products on his tray because he was Muslim and no beef because he is allergic to it. Banks also told staff that he was lactose intolerant and allergic to peanut butter. All of these food prohibitions were reflected in Banks' official diet orders and medical charts.[10]

Despite these orders, Banks was served a pork chop one day out of the week for six or seven months. Banks also received jello and other types of pudding on his tray numerous times during his commitment at the facility. (Banks believed that he could not eat the jello or the pudding because he believed that they contained pork by-products.[11]) When Banks' tray contained a pork or pork by-product, he would refuse the entire tray. When this happened, Banks generally did not receive a full meal replacement. Instead, EMHC provided him with only a snack or bag meal, which allegedly left Banks hungry.

The first time that Banks' tray contained pork, his meal was replaced with a bag dinner containing plastic containers of cold fish and an apple. Some of the other times that Banks' tray contained pork, he received extra food from the nursing manager. Towards the latter part of September 2007, another patient's father began sending Banks packages of food (which included

---

[10] On August 2, 2007, Dr. Chang put an order in Banks' chart for no beef and pork, and on August 22, 2007, he put an order in Banks' chart for no pork, jello, beef, milk, or milk products. (See Pl. Ex. S).

[11] An EMHC nurse (Ryma Jacobson) testified that she believed that the gelatin in the jello at the Center *did* in fact contain pork by-products. Brian Dawson (not a Defendant in this case) was the dietary manger in control of the dietary operations at the EMHC while Banks was there. The dietary manger decides what food EMHC purchases and serves. Dawson testified that the pudding and gelatin used at the Center did not contain pork by-products. No one at the Center ever showed Banks an ingredient list for the jello and pudding served at the Center. Plaintiffs attached an article as an exhibit to their response that states that the gelatin in jello is often derived from the collagen of pigs.

fruit juices, noodles, and other snacks like chips), which Banks ate at snack time.  The Center also gave Banks a liquid nutritional supplement called Ensure to help him maintain his weight. The Center also allowed Banks to keep some of his own food in the Center's kitchen.

While at EMHC, Banks observed Ramadan, which lasted from September 13 to October 12, 2007.[12]  Banks sincerely believed that observing Ramadan was central and essential to his faith.  During Ramadan, observant Muslims are required him to fast from sunrise to sunset. Banks' diet-related problems were allegedly exacerbated during this period, as all of the Center's meals were served during daylight hours.

Banks received no food at all from the Center during the first day of Ramadan.  On the second morning of Ramadan, the Center provided Banks with milk, cereal, a piece of fruit and a Danish before the sun rose.  On the second evening, Banks ate food that his family provided. For the third day of Ramadan and continuing for the next two weeks, EMHC provided Banks with a bag meal before sunrise and another bag meal after sunset.  Sometimes these meals included milk and peanut butter, which Banks could not consume.  Then, for three or four days, EMHC gave Banks a bag meal in the morning and a tray of food at night.  For the last two weeks of Ramadan, the Center reverted to giving Banks a bag meal in the morning and another at night. Throughout Ramadan, the Center never provided Banks with two bags at night to make up for the meal that he missed at lunchtime.

During his stay at EMHC, Banks complained about his diet on a near-daily basis.  Banks called the Hospital Administrator's office personally approximately once a week to voice these

---

[12] At his deposition, Banks testified that he observed Ramadan starting on October 2, 2007.  Banks filed an affidavit in opposition to Defendants' motion for summary judgment wherein he testified that he was mistaken when he gave this testimony and that he actually celebrated Ramadan from September 13 to October 12, 2007—at the same time the rest of the Muslim world celebrated it.  The Court takes judicial notice of the fact that Ramadan was celebrated from September 13 to October 12 in 2007 and accepts the fact that Banks also celebrated it at this time.  In any event, precisely when Banks celebrated Ramadan is not material to the resolution of the pending motions.

concerns. Banks also complained to Ibrahim about once a week when Ibrahim would walk through the unit. During his conversations with Ibrahim, Ibrahim told Banks to complain to the dietician. However, when the dietician came to see him, she told Banks to eat around the pork or other pork by-products. When Banks told Ibrahim about the dietician's response, Ibrahim said that there was nothing that he could do. Defendant Douherty wrote in Banks's medical chart that Banks mailed Defendant Almazar several complaints each week.

Banks also complained to the members of his "treatment team" at the Center about his diet on a regular basis.[13] Banks' treatment team included Defendants Dougherty, Watrous, and Husain. The treatment team met several times a week to discuss each patient's progress and to ensure their well-being. Food services were not a part of Dougherty, Watrous, or Husain's duties at the Center. However, the treatment team had a duty to field all patient complaints and route them to the proper Center staff member so that they could be resolved.

According to Banks, the members of his treatment team told him not to worry about the pork but to move it to the side. They also allegedly told Banks that he was not at the Center to practice Islam, but to get fit to stand trial and that he could practice his religion once he got out. Dr. Watrous also allegedly told Banks that no one would believe him about his complaints because he was crazy. Banks also alleges that Defendant Dougherty retaliated against Banks because of his complaints, restricting his ability to leave the unit and participate in various activities. Defendants Dougherty, Watrous, and Husain deny these allegations. Dr. Husain testified that in response to Banks' complaints about his diet, she spoke to Dr. Chang and the nurses and was assured that Banks was receiving an adequate diet. Dr. Watrous testified that he relayed Banks' complaints about his diet to other members of Banks' treatment team.

---

[13] Banks also made numerous complaints about his diet to others, including nurses, STAs, and to Jeff Pharis (the unit administrator).

There is no dispute that EMHC made some accommodation for Banks during his stay at EMHC. Defendants assert that the amount of acceptable food provided to Banks was sufficient. However, Banks testified that the Center did not provide him with enough food, and that he felt hunger pains and was lethargic during his stay. Certain of EMHC's "Daily Patient Care Flow Sheets" show that Banks often went days at a time without eating any food. For example, those records show that in September 2007, there were more than 25 days where Banks ate nothing. (Defendants contend that one cannot ascertain what a patient ate by only looking at the Daily Patient Care Flow Sheets.)

Banks is approximately six feet tall. On Banks' first day at the Center (August 2, 2007), Banks weighed 160 pounds. EMHC's records[14] stated that Banks' ideal body weight was 184 pounds. Over the next three weeks, Banks lost 29 pounds (he weighed 131 pounds on August 27, 2007). Banks weight remained around 130 pounds throughout his entire commitment at the Center. Several staff members testified that Banks was noticeably thin or underweight while he was committed. When Banks was transferred to the Chester Mental Health Center in June 2008, he weighed 127 pounds. His weight had increased to 155 pounds by August 2008.

## II. Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[14] Defendants interpose a number of objections based on Plaintiffs' purported use of hearsay in support of their motion and in response to Defendants' motion. Hearsay is inadmissible in a motion for summary judgment to the same extent that it is inadmissible at trial. *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002). The Court has carefully considered the facts challenged as hearsay and has disregarded any facts improperly before it. For example, Defendants take issue with Plaintiffs' citation to the CIA World Factbook to establish the number of Muslims living in the world. The Court has not considered the entry in the Factbook. (However, the Court is free to judicially notice the fact that Islam is in fact one of the world's major religions). In any event, most of the facts challenged as hearsay are properly before the Court. For example, Defendants argue that Plaintiffs cannot use the Center's own medical records to establish Banks' weight during his confinement. Were a proper foundation laid, these records would most likely be admissible under Federal Rule of Evidence 803(6).

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    Plaintiffs' Free Exercise Claims

First, Plaintiffs allege that Defendants Almazar and Ibrahim, in their individual capacities, violated their First Amendment rights to practice Islam by denying them access to Jumu'ah services (Count III). Prison litigation cases analyzing religious accommodations claims are pertinent to the analysis of Plaintiffs' claims. However, Defendants admit that Plaintiffs,

who were involuntarily committed, were "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). The Seventh Circuit has held in another context that claims by those civilly committed can be analyzed as analogous to the claims of pre-trial detainees. *Brown v. Budz*, 388 F.3d 904, 910 (7th Cir. 2005).

Prison inmates do not lose their First Amendment right to free exercise of religion by virtue of their confinement. *Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."); see also *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005) ("An inmate retains the right to exercise his religious beliefs in prison."). Correctional administrators must permit inmates a reasonable opportunity to exercise their religious freedom. See, *e.g. Tarpley v. Allen County, Indiana*, 312 F.3d 895, 898 (7th Cir. 2002) (citing *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)). First Amendment jurisprudence protects only "the observation of [ ] central religious belief[s] or practice[s]." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003).

A prisoner's freedom to exercise his religion, however, must be balanced against the legitimate penological objectives of the prison authorities. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Both security and economic concerns are legitimate penological demands. *Id.* ("[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives-including deterrence of crime, rehabilitation of prisoners, and institutional security."). Accordingly, regulations alleged to infringe constitutional rights are valid if "reasonably related to legitimate penological objectives." *Id.* at 349; *Turner*, 482 U.S. at 89.

Under *Turner*, the court must consider four factors in assessing whether a prison regulation is reasonably related to a legitimate penological interest: (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable. *Turner*, 482 U.S. at 89-90; see also *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991); *Williams v. Lane*, 851 F.2d 867, 877 (7th Cir. 1988). A standard of reasonableness, rather than heightened scrutiny, applies in the prison context to permit prison administrators "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration[,]" and thereby prevent unnecessary federal court involvement in the administration of prisons. *Id.* (quoting *Turner*, 482 U.S. at 89).

Accordingly, to prove a violation of the First Amendment, Plaintiffs must prove that their religious beliefs are sincere, that their desire to attend Friday Jumu'ah services are important to their belief system, and that Amazar and Ibrahim personally deprived Plaintiffs of the opportunity to attend Jumu'ah. If Plaintiffs prove these elements, Almazar and Ibrahim may show that they did not violate Plaintiffs' First Amendment rights by demonstrating a legitimate penological interest in denying Plaintiffs access to Jumu'ah services. *Turner*, 482 U.S. at 84; see also *Shatner v. Page*, 2009 WL 260788, at *21 (S.D. Ill. Feb. 4, 2009).[15]

---

[15] In order to recover under § 1983, Plaintiffs must show that their constitutional rights were violated by a person acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). This element is not at issue in this case, as Defendants admit that Almazar and Ibrahim were acting under color of state law with respect to all acts or omissions attributed to them in this litigation.

Here, there is no dispute that Plaintiffs are practicing Muslims who sincerely believe that attending Friday afternoon congregational Jumu'ah services is central and essential to their practice of Islam. There also is no dispute that during the time that each was confined at the Center (Banks for more than 10 months and Carlos for over a year) they repeatedly requested that Center staff members provide them an opportunity to attend Jumu'ah services. The Center never established Jumu'ah services until after Plaintiffs left; however, the Center did pay clergy to hold analogous services for other religions while Plaintiffs were confined there. Based on the foregoing, Plaintiffs have established that the denial of Jumu'ah services substantially burdened their First Amendment right to the free exercise of their religion.

Other courts—including the Supreme Court—have recognized the central role that Jumu'ah plays in the Islamic religion, and have found that the denial of Jumu'ah can substantially burden an adherent's practice of Islam. See, *e.g. Shabazz*, 482 U.S. at 351-52; *Eley v. Herman*, 2007 WL 1667624, at *3-4 (N.D. Ind. June 8, 2007); *Williams v. Washington*, 1996 WL 137670, at *4 (N.D. Ill. March 25, 1996). However, in many (if not most) cases, courts ultimately have concluded that the denial of weekly Jumu'ah services did not violate inmates' First Amendment rights in light of valid penological reasons that the prisons had in failing to hold the services. See *Shabazz*, 482 U.S. at 350-51; *Siddiqi v. Leak*, 880 F.2d 904, 910 (7th Cir. 1989) (no denial of inmate's free exercise rights where evidence did not reflect any restriction on inmate's ability to practice his religion, save for the inability to attend Jumu'ah services and the restriction is reasonably related to legitimate penological interests); *Bullock v. McGinnis*, 14 F.3d 604 (7th Cir. 1993) (unpublished opinion) ("defendants' denial of Bullock's access to the Jumu'ah services is supported by legitimate security concerns"); *Williams*, 1996 WL 137670, at *4; *Henderson v. Canteen Corp.*, 1993 WL 69683, at *5-6 (N.D. Ill. March 11, 1993). However,

in this case, Defendants have not articulated *any* penological interest that they had for failing to hold Jumu'ah services. Defendants, for example, identify no budgetary or security-related reasons why they could not have offered Jumu'ah services during the nearly two-year period in which one or both of the Plaintiffs were confined.[16]

And for this reason, Defendants' argument that Plaintiffs were "allowed to practice * * * religion in other ways" (Def. Mem. [151] at 7 (citing *Woods v. O'Leary*, 890 F.2d 883, 887 (7th Cir. 1989)), is inapposite. This argument is based on the second of the *Turner* factors (discussed above). The *Turner* factors are intended to guide courts in assessing whether a prison regulation is reasonably related to a legitimate penological interest. Here, because Defendants do not even attempt to justify their failure to hold Jumu'ah by asserting a valid penological interest, whether Plaintiffs were allowed other means of religious expression apart from Jumu'ah is irrelevant to the Court's analysis. See, *e.g. Russell v. Richards*, 384 F.3d 444, 447-48 (7th Cir. 2004) (*Turner* factors relevant to determining whether there is a "satisfactory connection between the jail's policy and the interest put forward to justify it"); *Johnson v. McCann*, 2010 WL 2104640, at *7 (N.D. Ill. May 21, 2010) ("Under *Turner*, the court must consider four factors in assessing whether a prison regulation is reasonably related to a legitimate penological interest").

Instead of focusing on the *Turner* factors, Defendants assert two arguments in support of their motion for summary judgment on Count III. First, Defendants argue that the undisputed material facts "show that Plaintiffs' religious accommodation claims were met." (Def. Mem.

---

[16] In light of the factual record developed by the parties, such a claim likely would be difficult for Defendants to make. In regard to the Center's budget, the Hospital Administrators never sought additional funds to pay for an imam to conduct Jumu'ah services. In any event, the Center satisfies its obligation to provide religious services to its patients through both paid and volunteer clergy. It appears that there were individuals willing to conduct Jumu'ah services (Kamal) for free, if only the Center had asked. At least on the current record, the Hospital Administrators could not claim that Jumu'ah services pose security concerns for the Center, since there is no reason to believe that Jumu'ah would pose a greater threat than the Christian and Jewish services that actually were held.

[151] at 6). Second, Defendants argue that "if a violation did occur it was not due to an action or failure to act" by Almazar or Ibrahim. *Id*. at 7-8.

Defendants' first argument is perplexing. With regard to Carlos, Defendants' argument rests on Carlos's deposition testimony that the Center did hold Muslim services on Monday and Friday, but that he was not allowed to go to them. (Def. Mem. [151], at 7.) According to Defendants, this testimony must be taken as true for the purposes of this motion, so therefore, "EMHC accommodated Muslims by providing Muslim services on Friday." *Id*.[17] As discussed above, Plaintiffs respond by attaching an affidavit from Carlos that explains that he was mistaken when he so testified. As a general matter, a plaintiff cannot defeat a motion for summary judgment by "contradict[ing] deposition testimony with later-filed contradictory affidavits." *Ineichen v. Ameritech*, 410 F. 3d 956, 963 (7th Cir. 2005); see also *Holland v. Jefferson Nat'l Life Ins. Co*., 883 F.2d 1307, 1312 (7th Cir. 1989). However the situation here is different from the run-of-the-mill case in which a party attempts to "thwart the purpose of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996). As explained above (*supra*, n.4), whether Carlos mistakenly believed that the Center held services on Monday and Friday at the time of his deposition is of no import—it is an undisputed fact that the Center did *not* hold Jumu'ah services (or any Muslim congregational services) when Carlos was there. (*supra*, n.3). If Carlos had testified in his deposition that he was the President of the United States during his time at the Center, it does not necessarily follow that the Court must accept as fact his clearly mistaken belief in deciding a motion for summary judgment. Put differently,

---

[17] The Court notes parenthetically that even if Carlos's testimony established that "EMHC accommodated Muslims" – which it does not, for the reasons explained below – it does not address whether Defendants accommodated *Carlos*, who testified that he was not allowed to attend the (non-existent) services in any event.

given Defendants' acknowledgment that there were no Jumu'ah services during the relevant time period, Carlos's initial (and now corrected) statement unquestionably was mistaken, and the only possible "sham" would be further proceedings on that issue.

Defendants' argument with regard to Banks is equally confounding. Banks repeatedly asked that Jumu'ah services be established during the ten months that he was at the Center. Defendants point out that that per Banks' requests, Jumu'ah services (led by an EMHC resident named Omar) were eventually established. Banks speculated in his deposition that if Omar had been permitted to lead Jumu'ah while Banks was at EMHC, that would have been an acceptable accommodation for him. However, Defendants readily admit that "Banks had already been transferred to the Chester Mental Health Center when Omar started leading Jumu'ah services." (Def. Mem. at 8). The Court fails to see how providing what would have been an acceptable solution for Banks *after* he left the Center (and many months after he first requested Jumu'ah services) absolves Defendants in any way. It is certainly true that evidence of subsequent remedial measures is inadmissible to prove liability. See Federal Rule of Evidence 407. However, the Court does not understand (and Defendants do not explain) how such evidence is relevant in establishing the opposite – namely, the absence of liability.[18]

Defendants' second argument is more promising. "'An individual cannot be held liable in a § 1983 action unless he caused or participated in [the] alleged constitutional deprivation.'" *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000) (quoting *Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir. 1996)); see also *Gossmeyer v. McDonald*, 128 F.3d 481, 495

---

[18] Plaintiffs argue that as Banks never attended an Omar-led service, his testimony that Omar would have been acceptable to him is pure speculation. Regardless, Plaintiffs aptly point out that if Omar was in fact an acceptable solution for Banks, "[t]his quick-fix clearly demonstrates that there was no legitimate governmental interest in denying such services [in the first place], that such services were an easy alternative to burdening Banks and Carlos's religious requests, and that there was little, if any, impact on the Center by allowing such services." Pl. Resp. [160] at 9 (citing *Turner*, 482 U.S. at 89-91).

(7th Cir. 1997) ("We reiterate that personal involvement is a prerequisite for individual liability in a § 1983 action."). There is no *respondeat superior* liability in § 1983 actions; instead superintendents of mental hospitals not only have "ability to delegate but also ability to rely on the decisions of subordinates." *Pacelli v. deVito*, 972 F.2d 871, 878 (7th Cir. 1992). Supervisors who are simply negligent in failing to detect and prevent subordinate misconduct are not personally involved. *Gossmeyer*, 128 F.3d at 495. Rather, in order to be personally liable, "'supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either *knowingly* or with *deliberate, reckless indifference*.'" *Id.* (emphasis in original) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)); see also *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2006) ("supervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent"). "A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (citation omitted).

Here, the undisputed material facts show that Defendants Almazar and Ibrahim were personally involved in the decision not to hold Jumu'ah services at the Center. It is undisputed that the Hospital Administrator is ultimately responsible for ensuring that the religious rights of all patients at the Center are respected and observed and has final policymaking authority regarding patients' religious requests. While Dr. Benzies coordinated all religious activity at the Center and was responsible for establishing and scheduling religious services, the Hospital Administrator was ultimately responsible for ensuring that Dr. Benzies was performing these obligations. But apart from supervisory duties, the Hospital Administrators were directly and

personally involved in decisions regarding which clergy to hire and the amount each is paid for his or her services. Accordingly, the Hospital Administrators knew that Christian priests and Jewish rabbis were paid to conduct services, while there was no Muslim imam on the payroll. It is undisputed that the Hospital Administrators had the power to arrange Jumu'ah services, but chose not to do so – at least until after Plaintiffs had left the Center.

Keeping those duties in mind, it is crucial to the disposition of the instant motion that no later than November 19, 2007 – the date on which Defendant Almazar was served with Plaintiffs' amended complaint – Defendant Almazar was personally aware that Banks' requests for Jumu'ah services at the Center were going unmet. Again, it is undisputed that the Hospital Administrators had the ultimate responsibility for ensuring that the religious rights of all patients at the Center were respected and observed. Yet upon receipt and investigation of the complaint, Defendant Almazar did not order that Jumu'ah services be established. By this conduct, Defendant Almazar "kn[e]w about the conduct and facilitate[d] [and] approved it." *Jones*, 856 F.2d at 992-93; see also *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) ("a prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition"); *Reed v. McBride,* 178 F.3d 849, 854-56 (7th Cir. 1999) (warden required to act where he received letters and grievances reporting that inmate was being denied life-sustaining medication and food); *cf. Jones v. Drew*, 221 Fed. Appx. 450, at *4 (7th Cir. 2007) (unpublished disposition) (supervisor not personally involved in alleged constitutional violation when, "[a]lthough [plaintiff] mailed a complaint to [the supervisor-defendant] and filed a grievance at [the prison] describing his frustration with his treatment, there is no evidence that

[the supervisor] personally received or read these communications since he delegated the review of prisoner complaints to others within his office"); *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) (granting summary judgment since official presented evidence that he did not receive, review or decide plaintiff's grievance). Because Almazar had the authority to order that Jumu'ah services be established, yet chose to do nothing, the "causal connection" between his omission and the misconduct complained of is satisfied. *Wolf-Lillie*, 699 F.2d at 869. Similarly, Defendant Ibrahim admits that he was personally aware of Banks' complaints regarding the lack of Jumu'ah services. Defendant Ibrahim was personally involved in the Center's failure to hold Jumu'ah services for the same reasons as was his predecessor. In sum, Defendants Almazar and Ibrahim did nothing to act on Banks's request for Jumu'ah services for a period of at least several months and no Jumu'ah services were available at EMHC until after Banks was transferred to another facility. For these reasons, Banks is entitled to summary judgment on Count III.

However, as noted above, the undisputed summary judgment evidence shows that Carlos left the Center about two weeks before Defendant Almazar was served with the amended complaint (which was the first court filing to mention the lack of Jumu'ah) and about two months before Defendant Ibrahim assumed Almazar's duties at EMHC.[19] It is undisputed that throughout the time that he was committed, Carlos repeatedly asked members of his treatment team, the head nurse, other nurses, and STAs for the opportunity to attend Islamic services, including Jumu'ah services. Further, Carlos spoke with a mediator on approximately two occasions and told her about his desire to attend Islamic services, including Jumu'ah. The mediator stated that she would forward his complaint to Defendant Almazar. At some point

---

[19] Carlos had left the Center by the time Defendant Ibrahim took over from Defendant Almazar as Hospital Administrator. Banks remained at the Center until June 6, 2008.

during his commitment, Carlos filed a complaint regarding his request to attend Islamic services and gave it to a nurse to put in his medical file to be submitted to the treatment team. These facts are sufficient to raise a question as to whether Defendant Almazar was personally aware of the fact that Carlos was requesting that he be allowed to attend Jumu'ah services. But because it is unclear whether Defendant Almazar was personally involved in the decision to not hold Jumu'ah services while Carlos was at the Center, summary judgment for either Carlos or Almazar on Carlos's religious services claim would be inappropriate.[20] However, because Carlos has come forward with no evidence at the summary judgment stage from which a trier of fact could find (or even infer) that Defendant Ibrahim – who did not assume his position as Acting Administrator of EMHC until after Carlos left the Center – was in any way involved in the events giving rise to Carlos's religious services claim, Ibrahim is entitled to summary judgment on Count III.

To be clear, the Court grants summary judgment for Banks and against Defendants Almazar and Ibrahim on Count III. A question of fact with regard to Carlos's claim in Count III against Defendant Almazar precludes summary judgment for either party; however, Defendant Ibrahim is entitled to summary judgment on Carlos's claim in Count III.

**B.      Plaintiffs' Equal Protection Clause Claims**

In Count IV, Plaintiffs allege that Defendants Almazar and Ibrahim, in their individual capacities, violated Plaintiffs' rights under the Equal Protection Clause by purposefully discriminating against them on the basis of their religion.

---

[20] Plaintiffs point to the fact that Defendant Almazar certainly knew during the time of Carlos's commitment that priests and rabbis were on the Center's payroll, but that no imam was being paid. This fact alone is does not establish that Defendant Almazar also knew of and condoned the decision to not hold Jumu'ah. In fact, during Carlos's commitment, unpaid volunteers from the Institute of Islamic Education conducted Taleem at the Center. These same volunteers could have conducted Jumu'ah services.

The Seventh Circuit has held that in providing prisoners a reasonable opportunity to practice their religion, "the efforts of prison administrators, when assessed in their totality, must be evenhanded." *Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991). "Prisons cannot discriminate against a particular religion." *Id.* (citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972) and *Cooper v. Pate*, 378 U.S. 546, 546 (1964)). "The rights of inmates belonging to minority or non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations. Of course, economic and, at times, security constraints may require that the needs of inmates adhering to one faith be accommodated differently from those adhering to another. Nevertheless, the treatment of all inmates must be qualitatively comparable." *Id.*; see also *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988) ("[u]nequal treatment among inmates [ ] is justified if it bears a rational relation to legitimate penal interest."). However, prison officials are not required to provide "equal apportionment, or identical opportunities." *Ra Chaka v. Franzen*, 727 F. Supp. 454, 460 (N.D. Ill. 1989); see also *Cruz*, 405 U.S. at 322 n.2 ("We do not suggest, of course, that every religious sect or group within a prison-however few in number-must have identical facilities or personnel."). Moreover, there is no requirement that courts "adopt a numerical standard in analyzing prisoner religious equal protection claims." *Ra Chaka*, 727 F. Supp. at 460 (citing *Butler-Bey v. Frey*, 811 F.2d 449, 453-54 (8th Cir. 1987)).

A plaintiff asserting an equal protection violation must establish that a state actor has treated him differently because of his membership in a particular class and "that the state actor did so purposefully." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000); *Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1220 (7th Cir. 1994). Discriminatory purpose "implies that the decision-maker singled out a particular group for disparate treatment and

selected his course of action at least in part for the purpose of causing its adverse effects on an identifiable group." *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982).

An equal protection claim under the Fourteenth Amendment is only a claim of arbitrariness unrelated to the character of the activity allegedly discriminated against. *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988) (most claims of discrimination based on religion are "governed by the religion clauses of the First Amendment, leaving for the equal protection clause only a claim of arbitrariness unrelated to the character of the activity allegedly discriminated against").

As an initial matter, it is undisputed that Carlos left the Center before Defendant Ibrahim took over as Hospital Administrator. There are no facts in the record sufficient to raise a question for trial regarding whether Defendant Ibrahim was involved in any discrimination against Muslims that took place while Carlos was committed to EMHC. Accordingly, the Court grants summary judgment in favor of Defendant Ibrahim and against Carlos on Count IV.

However, the facts adduced by Plaintiffs raise a question for trial as to whether (1) Defendants Almazar and Ibrahim purposefully discriminated against Banks, and (2) Defendant Almazar purposefully discriminated against Carlos, because of their religion. There are a number of facts in the record that could support such a claim. For example, the Center did not separately track the number of Muslims committed to the Center in their official charts, while they did record the number of, for example, Lutherans and Methodists. During the time that Plaintiffs were committed, EMHC paid a Christian priest, a Jewish rabbi, and an ecumenical chaplain to lead services each month. The Center did not pay a Muslim imam and made no attempts to secure the volunteer services of one despite (1) the obvious availability of imams in the area and (2) the fact that there were on average twice as many Muslim patients at the Center

than Jewish patients (around 10-15 individuals at any given time). Again, Almazar and Ibrahim had control over the Center's budget and decided which clergy members would be paid and at what amount. Further, there is an unresolved question as to whether the Hospital Administrators ignored Dr. Benzies' repeated requests for additional funds to be used to hire an imam. And as discussed above, Defendants have offered no rationale for why the needs of Muslim patients needed to be accommodated differently from those who adhered to other religions.

On the other hand, there are a number of facts that could support the opposite inference — that Defendants Almazar and Ibrahim did not intentionally discriminate against Plaintiffs. That the Center paid priests and rabbis to minister to its Jewish and Christian patients does not necessarily mean that Defendants' aim was to disadvantage Muslims, for it is undisputed that due to budget constraints, EMHC relied on both paid clergy and volunteers to meet patients' religious needs. The Hospital Administrators could have believed that Kamal and Toft (the volunteers from the Institute of Islamic Education) were adequately meeting the needs of Muslim patients. Further, Defendant Ibrahim testified that he believed that the ecumenical priest adequately covered the needs of Muslim patients at the Center. Moreover, the Hospital Administrators saw to it that *some* services (including Taleem) were provided for Muslims.

Accordingly, the Court concludes that there is a disputed question of fact regarding whether (1) Defendants Almazar and Ibrahim *purposefully* discriminated against Banks, and (2) Defendant Almazar *purposefully* discriminated against Carlos, because of their religion. As explained above, unlike Plaintiffs' Free Exercise Clause claim, Plaintiffs' Equal Protection claim requires them to prove that Defendants Almazar and Ibrahim intentionally discriminated against them. While "discriminatory intent need not be proved by direct evidence," *Rogers v. Lodge*, 458 U.S. 613, 618 (1982), the Seventh Circuit has recognized that "[a]s a general rule, a party's

state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 594 (7th Cir. 2007). The evidence discussed above shows that here the inferences that might be drawn concerning Defendant Almazar's and Ibrahim's state of mind are disputed.

### C. Banks' Religious Diet Claim

Banks alleges that Defendants Almazar, Ibrahim, Dougherty, Husain, and Watrous, in their individual capacities, violated his First Amendment rights by refusing to provide him with an adequate diet that met his religious needs (Count VII). EMHC had an obligation to provide Banks with a nutritionally adequate diet that complied with his religious beliefs. The Seventh Circuit has held that "a prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition." *Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009); see also *Lunsford v. Bennett,* 17 F.3d 1574, 1580 (7th Cir. 1994) ("A well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required."). For example, in *Hunafa v. Murphy*, the Seventh Circuit held that the Illinois Department of Correction's failure to ensure that the preparation of meals kept pork separate from other food substantially burdened a Muslim prisoner's religious practice because it forced him to "an improper choice between adequate nutrition and the tenets of his faith." 907 F.2d 46, 47 (7th Cir. 1990). Other courts of appeals likewise have found such a choice to be substantially burdensome. See *Nelson*, 570 F.3d at 879-880 (citing *Love v. Reed*, 216 F.3d 682, 689-690 (8th Cir. 2000) (finding prison's failure to accommodate prisoner's religious diet substantially burdensome and rejecting prison's suggestion that the prisoner could fast as an alternative to the prison's accommodation of the desired diet); *McElyea v. Babbitt*, 833 F.2d 196,

198 (9th Cir. 1987) ("Inmates * * * have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion.").

The Court concludes that numerous disputed issues of material fact preclude summary judgment for Defendants on Banks' religious diet claim. Contrary to Defendants' arguments, it is not clear from the record that the Center provided Banks with a constitutionally adequate diet.

Banks was served pork on numerous occasions during his commitment (rendering the entire tray forbidden to him). When the Center was serving pork, Banks received replacement "bag meals." It is disputed whether these meals contained an adequate amount of nutrition (considering further that Banks could not eat the peanut butter and milk that often was included in these meals). Further, it is disputed whether the jello and pudding served to Banks contained pork by-products; in any event, it does not appear that anyone took the time to show Banks an ingredient list that would have assuaged Banks' concerns about those foods. While the Center did provide some accommodations for Banks during Ramadan, it is disputed whether Banks received enough food that he could medically or religiously tolerate. Further, while it is undisputed that the Center allowed him to eat some food from the outside (including food brought to him by the nursing manager), it is disputed whether this additional outside food was sufficient to meet Banks nutritional needs.

Bolstering Banks' claim that he was forced "to choose between his religious practice and adequate nutrition" *Nelson*, 570 F.3d at 879, is the fact that Banks lost 30 pounds during his first three weeks at the Center, and maintained that low weight throughout his stay. The Center's records show that Banks often went days at a time without eating any food. Just weeks after being transferred to another facility, Banks had regained most of those 30 lost pounds. A number of Center employees testified that Banks appeared underweight during his commitment.

Further, there are sufficient facts in the record to raise a question for trial as to whether each of Defendants was personally responsible for denying Banks a nutritionally-adequate diet that met Banks' religious needs. The Court will not repeat the legal standard that Banks is required to satisfy in order to establish personal involvement in a constitutional violation (see *supra* pp. 20-23). But again, it is undisputed that the Hospital Administrators personally knew about Banks' repeated, near-daily complaints about his religious diet. Likewise, it is undisputed that the Hospital Administrators had the ultimate responsibility for ensuring that the religious rights of all patients at the Center were respected and observed. Yet, the facts in the record are sufficient to raise a question regarding whether, upon receipt of Banks' complaints, the Hospital Administrators failed to intervene to ensure that Banks' needs were being met. To the contrary, Defendant Ibrahim allegedly told Banks that "there was nothing he could do" when the dietician allegedly told Banks to simply eat around the pork or pork by-products on his tray.

Similarly, there are sufficient facts in the record to raise a question as to whether Defendants Dougherty, Husain, and Watrous was each personally responsible for Banks' diet. Although food services were not a part of Dougherty's, Watrous's, or Husain's duties at the Center, they each had a duty to route all patient complaints to the proper Center staff member so that the complaints could be resolved. According to Banks, the members of the treatment team ignored his complaints about his diet and stood by idly as his weight dropped. Further, Banks testified that the members of the treatment team actively participated in the Center's serving of "haraam" food by telling Banks to eat around the pork that was on his tray. They also allegedly told Banks that he was not at the Center to practice Islam, but to get fit to stand trial and that he could practice his religion once he got out. Dr. Watrous also purportedly told Banks that no one would believe him about his complaints because he was crazy. Banks also alleges that

Defendant Dougherty retaliated against Banks because of his complaints, restricting his ability to leave the unit and participate in various activities. Of course, the treatment-team Defendants all deny these allegations. Dr. Husain testified that in response to Banks' complaints about his diet, she spoke to Dr. Chang and the nurses and was assured that Banks was receiving an adequate diet. Dr. Watrous testified that he relayed Banks' complaints about his diet to other members of Banks' treatment team.

The foregoing discussion shows that there are multiple genuine issues of material fact regarding the role that each of the treatment team-Defendants played regarding Banks' religious diet. Accordingly, Defendants' motion for summary judgment on Count VII is respectfully denied.

### D.      Qualified Immunity

Finally, in their memorandum in support of their motion for summary judgment [151] Defendants contend that if the Court finds that any of Plaintiffs' rights have been violated, they are shielded from damages by the doctrine of qualified immunity. The doctrine of qualified immunity "gives public officials the benefit of legal doubts" by insuring that "officers are on notice their conduct is unlawful" before they are subject to suit. *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Defendants will be denied qualified immunity only when the rights that have been violated are sufficiently particularized to have put potential defendants on notice that their conduct was unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), the United States Supreme Court held:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful * * * but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Applying the standard to the circumstances of this case, Defendants' qualified immunity argument fails as to each of Plaintiffs' claims. To begin with, Defendants Alamzar and Ibrahim are not protected by qualified immunity for denying Banks access to Jumu'ah services. It is well established that prison officials violate a prisoner's free exercise rights when they prevent him from performing religious acts of central significance to his faith without adequate justification. See *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005); *Shabazz*, 482 U.S. at 349-353. Should Carlos establish that Defendant Almazar was personally involved in denying him access to Jumu'ah, qualified immunity would not protect Almazar from Carlos's claim for denial of religious services either. Similarly, it is well established that prison officials may not discriminate against prisoners on the basis of their religion. See, *e.g. Al-Alamin*, 926 F.2d at 686 (citing *Cruz*, 405 U.S. at 322 and *Cooper*, 378 U.S. at 546). If Plaintiffs can prove that Defendants purposefully discriminated against them without legitimate justification because they were Muslim, qualified immunity would not protect Defendants. Finally, it is well established that a prison official violates a prisoner's right to practice his religion when the prison forces him to choose between his religious practice and adequate nutrition. See, *e.g. Nelson*, 570 F.3d at 879. If Banks succeeds on that claim, qualified immunity would not preclude Defendants' liability as a matter of law.

## IV.    Banks' Motion for Law Library Time

Banks, on his own (not through his attorney), has filed a motion for law library time [167]. In the motion, Banks states that he is currently a prisoner in the Cook County Jail. Banks states that the jail's policy is that a pretrial detainee must obtain a court order in order to have access to the law library. Banks states that postage stamps are distributed through the library, and without access to the library, Banks cannot get the stamps that he needs to stay in contact

with his attorneys.  Banks motion [167] for court-ordered access to the law library is denied. Due to penological concerns of security and orderly administration, the court will defer to the judgment of Cook County Jail officials with respect to scheduling inmates' use of the law library.  See *Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir. 1997) ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").  Nevertheless, the court certifies that the above-captioned case is pending in federal court.  The court accordingly requests that jail officials grant Plaintiff reasonable access to the law library (and to the stamps that he needs in order to communicate with his attorneys), in a manner to be determined by jail administrators. Accordingly, the clerk is directed to mail a copy of this order to the executive director of the Cook County Correctional Center.

## V.     Conclusion

For the foregoing reasons and in the manner described above, Defendants' motion [150] is granted in part (as to Count III in regard to Plaintiff Carlos's claim against Defendant Ibrahim) and denied in all other respects.  Plaintiffs' motion [153] is granted in part (as to Count III in regard to Plaintiff Banks's claim against both Defendants) and denied in all other respects. Banks' motion for law library time [167] is respectfully denied; however the clerk is directed to mail a copy of this order to the executive director of the Cook County Correctional Center.

Dated:  March 30, 2011

_____
Robert M. Dow, Jr.
United States District Judge